Weldon J. CARLISLE, et al., Appellants,

v.

PHILIP MORRIS, INC., et al., Appellees.

No. 3–89–175–CV.

Court of Appeals of Texas, Austin.

Feb. 6, 1991.

Rehearing Overruled April 3, 1991.

Mike Davis, Byrd, Davis & Eisenberg, Austin, for appellants.

Jack D. Maroney, Brown Maroney & Oaks Hartline, Austin, for Philip Morris, Inc.

John Coates, Clark, Thomas, Winters & Newton, Austin, for R.J. Reynolds Tobacco Co.

Ernest E. Figari, Jr., Figari & Davenport, Dallas.

Nancy Ebe, Matthews & Branscomb, Austin, for The American Tobacco Co.

Robert Summers, Thornton, Summers, Biechlin, Dunham & Brown, San Antonio, for Liggett & Myers, Inc., et al.

Lea F. Courington, Gwinn & Roby, Dallas, for The Tobacco Institute, Inc.

William K. Wilde, Bracewell & Patterson, Houston, for The Council for Tobacco Research–U.S.A., Inc.

Michael Hendryx, Tucker, Hendryx & Gascoyne, Houston, for H.E. Butt Grocery Co.

Before POWERS, JONES and EARL W. SMITH,* JJ.

JONES, Justice.

This appeal presents the question of whether the Federal Cigarette Labeling and Advertising Act, 15 U.S.C. §§ 1331–1341 (1982 & Supp.1990) ("Labeling Act"), preempts state common-law tort claims for injuries or death allegedly suffered as a result of smoking cigarettes. Plaintiffs below were two individuals alleging injuries and two widows alleging wrongful death.[1] Defendants below were various cigarette manufacturers, wholesalers, and related entities.[2] In four separate suits, plaintiffs alleged five causes of action: (1) failure to warn; (2) design defects; (3) manufacturing defects; (4) affirmative misrepresentation; and (5) civil conspiracy. After consolidating the four cases, the trial court granted the defendants' motions for summary judgment on the ground that the Labeling Act preempted all of the plaintiffs' claims. Plaintiffs perfected this appeal. We will reverse the trial court's judgment and remand the cause.

## PLAINTIFFS' CLAIMS

Plaintiff Carlisle smoked for over sixty-five years. He now suffers from laryngeal cancer, which he alleges was caused by prolonged cigarette smoking. Plaintiff Woods, a cigarette smoker for fifty-three years, suffers from lung cancer, which he alleges was caused by prolonged smoking. The deceased spouses of plaintiffs Rothgeb and Dyer smoked cigarettes for forty-four and thirty-eight years, respectively; both died from lung cancer, which those plaintiffs also allege was caused by prolonged cigarette smoking.

Plaintiffs each alleged the same five theories of recovery. First, under the doctrine of strict liability, they alleged a *defective design* cause of action for marketing "a defectively designed product; a product which was unreasonably dangerous as designed, taking into consideration the utility of the product and the risk involved in its use." Second, also under the strict liability doctrine, plaintiffs alleged a *manufacturing defect* cause of action for marketing "a defective and unreasonably dangerous product; a product that is dangerous to an extent beyond that which would be contemplated by the ordinary user of the product with the ordinary knowledge common to the community as to the product's characteristics." Third, under both strict liability and negligence, plaintiffs alleged a *failure-to-warn* cause of action for failing "to give adequate warnings of the danger or adequate instruction for safe use" of cigarettes. Fourth, based on the RESTATEMENT (SECOND) OF TORTS § 402B, plaintiffs alleged a *misrepresentation* cause of action for "affirmatively misrepresenting to the public that cigarette smoking did not involve significant health hazards." Fifth, plaintiffs alleged a cause of action for *civil conspiracy*, alleging that defendants had engaged in "both negligent

---

* Before Earl W. Smith, Justice (retired), Third Court of Appeals, sitting by assignment. *See* Tex.Gov't Code Ann. § 74.003 (1988).

1. Weldon J. Carlisle; Gilmer T. Woods; Phyllis T. Rothgeb, individually and as Administratrix of the Estate of John R. Rothgeb, deceased; and Nadia Leanora Dyer, individually and as Administratrix of the Estate of Gerald Wayne Dyer, deceased. For clarity, these parties, appellants in this Court, will be referred to herein as "plaintiffs."

2. Philip Morris, Inc.; R.J. Reynolds Tobacco Company; The American Tobacco Company; Liggett & Myers, Inc.; Liggett & Myers Tobacco Company; Liggett Group, Inc.; The Tobacco Institute, Inc.; The Council for Tobacco Research—U.S.A., Inc.; and H.E. Butt Grocery Company. For clarity, these parties, appellees in this Court, will be referred to herein as "defendants."

and grossly negligent conduct in concert ... in an effort to nullify the overwhelming medical evidence that cigarette smoking is addictive and causes lung cancer and death."

Plaintiffs did not contend that defendants violated any provision of the Labeling Act itself.

Defendants filed motions for summary judgment, arguing (1) that the Labeling Act preempted all of plaintiffs' claims, and (2) that plaintiffs' claims were not viable as a matter of substantive law. The trial court granted summary judgment for defendants solely on preemption grounds.

## MOTION TO STRIKE

Before discussing the merits of the plaintiffs' single point of error, we address defendants' motion to strike a portion of plaintiffs' brief. Under the subheading "An Overview of the Problem," the statement-of-facts section of plaintiffs' brief contains a lengthy dissertation on the dangers of smoking and the evils of the tobacco industry. Citing and quoting from a host of scientific and medical books, pamphlets, and journals—none of which is in the record—plaintiffs' brief sets forth twelve pages of "facts" interspersed with disparaging comments about the defendants. It is this portion of plaintiffs' brief that defendants ask this Court to strike.

■ It is elementary that, with limited exceptions not material here, an appellate court may not consider matters outside the appellate record. *Sabine Offshore Service, Inc. v. City of Port Arthur*, 595 S.W.2d 840 (Tex.1979); *Perry v. Kroger Stores, Store No. 119*, 741 S.W.2d 533 (Tex.App. 1987, no writ). That record consists of the transcript and, where necessary, a statement of facts. Tex.R.App.P. 50(a). Material outside the record that is improperly included in or attached to a party's brief may be stricken. *Henslee v. State*, 375 S.W.2d 474 (Tex.Civ.App.1963, writ ref'd n.r.e.); *Humble Oil & Refining Co. v.*

*State*, 158 S.W.2d 336, 338 (Tex.Civ.App. 1942, writ ref'd).

■ Scientific and medical publications such as those referred to in plaintiffs' brief are outside the record unless they have been properly submitted to the trial court and included as part of the evidence. Indeed, in the trial court, statements from "learned treatises" are admissible only in conjunction with testimony by an expert witness, "even when the authority of the publication is otherwise established." Goode, Wellborn, & Sharlot, *Guide to the Texas Rules of Evidence: Civil and Criminal* 596 (1988); *see* Tex.R.Civ.Evid. 803(18).

Accordingly, we grant defendants' motion to strike. Given the present posture of this appeal, we will not require plaintiffs to rebrief;[3] however, in making our decision, we have not considered the offending portion of their brief.

■ For their part, defendants here have been guilty of a similar transgression. Attached as appendices to their briefs are copies of numerous orders, judgments, and other materials from a variety of state and federal trial courts purporting to reflect decisions upholding federal presumption in cigarette cases. As far as we can tell, these decisions are neither published nor scheduled for publication. They do not appear in the transcript as part of the summary judgment evidence. To the extent defendants intend for such rulings to be legal precedent, the Texas Rules of Appellate Procedure expressly prohibit the citation of unpublished opinions. Tex.R.App.P. 90(i). To the extent they are cited merely to show the existence of such decisions, they constitute facts outside the record. In either event, those portions of defendants' briefs are stricken *sua sponte*.

## THE LABELING ACT

In 1964 the Surgeon General of the United States issued a widely publicized report implicating cigarette smoking as a cause of lung cancer and other diseases. In 1965

---

**3.** Future litigants in this Court should take heed, however. We will not hesitate, on motion or *sua sponte*, to require rebriefing for a flagrant rule violation. Tex.R.App.P. 74(p).

Congress responded to that report and the growing awareness of the health hazard posed by cigarettes by passing the Labeling Act. The most salient feature of the Act was a requirement that warning labels be placed on all cigarette packages and advertisements.[4]

Substantially amended in 1970 and again by the Comprehensive Smoking Education Act of 1984, the Labeling Act contains a declaration of policy, which states that:

It is the policy of the Congress, and the purpose of this chapter, to establish a comprehensive Federal program to deal with cigarette labeling and advertising with respect to any relationship between smoking and health, whereby—

(1) the public may be adequately informed about any adverse health effects of cigarette smoking by inclusion of warning notices on each package of cigarettes and in each advertisement of cigarettes; and

(2) commerce and the national economy may be (A) protected to the maximum extent consistent with this declared policy and (B) not impeded by diverse, nonuniform, and confusing cigarette labeling and advertising regulations with respect to any relationship between smoking and health.

15 U.S.C. § 1331.

The Act also contains a preemption provision, which reads as follows:

(a) No statement relating to smoking and health, other than the statement required by section 1333 of this title, shall be required on any cigarette package.

(b) No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this chapter.

15 U.S.C. § 1334. Other significant sections of the Labeling Act prohibit cigarette advertising on radio and television (§ 1335), require manufacturers to provide annually a list of ingredients added to tobacco in the manufacturing process (§ 1335a), require the Secretary of Health and Human Services and the Federal Trade Commission to report to Congress annually concerning various cigarette-related issues (§ 1337), require the Secretary of Health and Human Services to carry out a public information program about the dangers of cigarette smoking (§ 1341), and provide for criminal penalties for violations of the Act (§ 1338).

### PRIOR COURT DECISIONS

Ten reported appellate court opinions, five federal and five state, have previously addressed the preemptive effect of the Labeling Act on common-law tort claims for injury from smoking cigarettes. We will briefly summarize the history and holdings of each of those cases, in chronological order.

1. *Cipollone v. Liggett Group, Inc.,* 789 F.2d 181 (3rd Cir.1986) (Cipollone I), *rev'g* 593 F.Supp. 1146 (D.N.J.1984), *cert. denied,* 479 U.S. 1043, 107 S.Ct. 907, 93 L.Ed.2d 857 (1987), *on remand,* 649 F.Supp. 664 (D.N.J.1986), and 683 F.Supp. 1487 (D.N.J.1988), *aff'd in part,* 893 F.2d 541 (3rd Cir.1990) (Cipollone II).

In *Cipollone,* the plaintiff sued under strict liability, negligence, intentional tort, and breach of warranty. In a lengthy opin-

---

**4.** The original warning was "Caution: Cigarette Smoking May Be Hazardous to Your Health." Pub.L. No. 89–92, § 4, 79 Stat. 283 (1965). In 1970 that warning was strengthened to read "Warning: The Surgeon General Has Determined That Cigarette Smoking Is Dangerous to Your Health." Pub.L. No. 91–222, § 2, 84 Stat. 88 (1970). In 1984, Congress again revised the warning to require, on a rotational basis, the following:

SURGEON GENERAL'S WARNING: Smoking Causes Lung Cancer, Heart Disease, Emphysema, And May Complicate Pregnancy.

SURGEON GENERAL'S WARNING: Quitting Smoking Now Greatly Reduces Serious Risks to Your Health.

SURGEON GENERAL'S WARNING: Smoking By Pregnant Women May Result in Fetal Injury, Premature Birth, And Low Birth Weight.

SURGEON GENERAL'S WARNING: Cigarette Smoke Contains Carbon Monoxide.

15 U.S.C. § 1333.

ion, the district court denied the defendants' motion for judgment on the pleadings, holding that none of the plaintiffs' claims were preempted by the Labeling Act. 593 F.Supp. 1146. The Court of Appeals for the Third Circuit reversed, concluding that, although the Act neither expressly preempted such claims nor "occupied the field" relating to cigarettes and health, nonetheless such claims "actually conflicted" with the purposes and objectives of the Act. The court held that the Act preempts "those state law damage actions relating to smoking and health that challenge either the adequacy of the warning on cigarette packages or the propriety of a party's actions with respect to the advertising and promotion of cigarettes." 789 F.2d at 187. The appellate court remanded the cause to the district court for determination of which claims were preempted by the Act. On remand, the district court concluded that the plaintiffs' failure-to-warn, fraudulent-misrepresentation, express-warranty, and conspiracy-to-defraud claims were preempted to the extent they sought to challenge the defendants' advertising, promotional, and public relations activities. 649 F.Supp. at 668–75. On further appeal after trial, the court of appeals affirmed the district court's preemption ruling, although other aspects of the district court's judgment were reversed and the cause remanded for new trial. 893 F.2d at 581–83.

2. *Stephen v. American Brands, Inc.*, 825 F.2d 312 (11th Cir.1987).

In *Stephen*, the widow of a deceased smoker sued, at least in part, on a failure-to-warn theory. The defendant answered that some of the plaintiff's claims were preempted by the Labeling Act. The plaintiff moved to strike that defense. The district court denied the motion, relying on *Cipollone I.* On appeal, the Court of Appeals for the Eleventh Circuit affirmed without significant discussion, adopting the "decision and reasoning" of the Third Circuit in *Cipollone I.*

3. *Palmer v. Liggett Group, Inc.*, 825 F.2d 620 (1st Cir.1987), *rev'g* 633 F.Supp. 1171 (D.Mass.1986).

In *Palmer*, the widow of a smoker sued primarily under a failure-to-warn theory, although the complaint also included allegations of "negligence in not making cigarettes safer" as well as breach of implied warranties of merchantability and fitness. The defendants filed a motion to dismiss all claims based on failure to warn. The district court denied the motion. The court expressly disagreed with the Third Circuit's opinion in *Cipollone I*, choosing instead to follow the opinion of Judge Sarokin, the *Cipollone* trial judge. 633 F.Supp. at 1173. On appeal, the Court of Appeals for the First Circuit reversed on "actual conflict" grounds, holding that permitting such common-law failure-to-warn claims would "disrupt[ ] excessively" the "carefully wrought balance of national interests" struck by Congress in passing the Labeling Act. 825 F.2d at 626.

4. *Phillips v. R.J. Reynolds Industries, Inc.*, 769 S.W.2d 488 (Tenn.Ct.App.1988).

In *Phillips*, it appears that a smoker who contracted Buerger's disease sued solely on a theory of failure to warn. The trial court granted summary judgment for the cigarette companies on the basis of preemption. Relying primarily on *Palmer*, the Tennessee Court of Appeals affirmed. 769 S.W.2d at 490.

5. *Roysdon v. R.J. Reynolds Tobacco Co.*, 849 F.2d 230 (6th Cir.1988), *aff'g* 623 F.Supp. 1189 (D.C.Tenn.1985).

In *Roysdon*, a long-time smoker sued on two grounds: that cigarettes are "defective and unreasonably dangerous" and that the warnings on cigarette packages and in cigarette advertising are inadequate. The district court granted the defendant's motion to dismiss that portion of the complaint resting on inadequate warnings, on the basis that such claims were preempted by the Labeling Act. 623 F.Supp. at 1190–91. The plaintiffs' "unreasonably dangerous" claim was tried to a jury, following which the court directed a verdict for defendant on substantive-law grounds. 623 F.Supp. at 1191–92. The Court of Appeals for the Sixth Circuit affirmed, relying on *Cipollone I* and *Palmer*.

6. *Forster v. R.J. Reynolds Tobacco Co.*, 437 N.W.2d 655 (Minn.1989), *rev'g in part* 423 N.W.2d 691 (Minn.Ct.App.1988).

In *Forster,* a smoker with inoperable lung cancer and his wife brought suit in Minnesota state court under theories of strict products liability, breach of warranty, and negligence. The trial court, relying on *Cipollone I,* granted summary judgment for the defendants on preemption grounds. The Minnesota court of appeals, rejecting the *Cipollone I* appeals court decision and relying instead on the *Cipollone* district court opinion, reversed the summary judgment as to all causes of action. 423 N.W.2d at 692–93. On further appeal, the Minnesota Supreme Court affirmed in part and reversed in part. The court held that "any state claim that questions the adequacy of cigarette advertising or promotion with respect to smoking and health, or which questions the effect of that advertising or promotion on the federal label, is preempted." 437 N.W.2d at 660. On the other hand, the court held that claims not based on a failure to warn (such as strict liability based on a risk-utility theory, affirmative misrepresentation, and breach of warranty) do not conflict with the objectives of the Labeling Act and are therefore not preempted. *Id.* at 661–62.

7. *Pennington v. Vistron Corp.,* 876 F.2d 414 (5th Cir.1989).

In *Pennington,* the widow of a smoker who had died of cancer of the esophagus sued various cigarette manufacturers, claiming that the companies had failed to provide adequate warnings and that cigarettes are unreasonably dangerous per se. The district court granted summary judgment for the manufacturers on all counts. On appeal, the court of appeals held that the failure-to-warn claim was preempted by the Labeling Act, but that the other claim was not. 876 F.2d at 420–23.

8. *Hite v. R.J. Reynolds Tobacco Co.,* 396 Pa.Super. 82, 578 A.2d 417 (1990).

In *Hite,* the widow of a deceased smoker sued under theories of defective design and failure to warn. On the basis of preemption, the trial court dismissed both grounds as to a manufacturer against which there were no pre–1965 allegations. On appeal, the Pennsylvania Superior Court held that the failure-to-warn claim was preempted, but that the defective-design claim was not. 578 A.2d at 420. Nonetheless, the appeals court affirmed the dismissal of the defective-design claim on substantive law grounds. *Id.* at 420–21.

9. *Dewey v. R.J. Reynolds Tobacco Co.,* 577 A.2d 1239 (N.J.1990), *rev'g in part* 225 N.J.Super. 375, 542 A.2d 919 (1988), *aff'g* 216 N.J.Super. 347, 523 A.2d 712 (1986).

In *Dewey,* the widow of a smoker who had died of lung cancer sued under theories of design defect, failure to warn, and misrepresentation. The defendants filed a motion to dismiss on the ground that all claims were preempted by the Labeling Act. The trial court, believing itself bound by the Third Circuit's ruling in *Cipollone I,* dismissed the claims founded on failure to warn and misrepresentation. 523 A.2d at 716. However, the court held that the plaintiff's design defect claim was not preempted, even under *Cipollone I,* and denied the motion as to that claim. *Id.* at 716–18. On appeal, the appellate division of the superior court held that it was unnecessary to determine whether or not it was bound by the holding in *Cipollone I,* because it had concluded, on independent review, that the trial court's judgment was correct and should be affirmed. 542 A.2d at 920. On further appeal, the New Jersey Supreme Court reversed the preemption-based dismissal, holding that (1) it was not bound by *Cipollone I,* and (2) the Labeling Act did not preempt any of the plaintiff's claims, including that founded on failure to warn. 577 A.2d at 1243–44.

10. *Rogers v. R.J. Reynolds Tobacco Co.,* 557 N.E.2d 1045 (Ind.Ct.App.1990).

In *Rogers,* the widow of a deceased cigarette smoker sued under three theories: (1) failure to warn, (2) design defect, and (3) fraud, constructive fraud, and fraudulent concealment. The trial court granted summary judgment in favor of defendants, apparently without specifying a basis. Relying on *Cipollone I,* the Indiana Court of Appeals held that the plaintiff's post–1965 failure-to-warn and fraud claims were

preempted. 557 N.E.2d at 1050–51, 1055. The court held, however, that the design-defect claim was not preempted. *Id.* at 1051.

## CONCLUSIVENESS OF LOWER FEDERAL COURT DECISIONS

■ As discussed above, the five federal courts of appeals that have written on the preemptive effect of the Labeling Act are unanimous in their conclusion that common-law failure-to-warn claims, at least, are preempted. *See Pennington,* 876 F.2d 414; *Roysdon,* 849 F.2d 230; *Palmer,* 825 F.2d 620; *Stephen,* 825 F.2d 312; *Cipollone,* 789 F.2d 181. This raises the threshold issue of whether this Court is bound by decisions of lower federal courts on questions of interpretation of federal statutes. We conclude we are not.

This Court has held that "[w]hile a decision of a federal court, other than the Supreme Court, may be persuasive in a state court on a federal matter, it is, nevertheless, not binding, since the state court owes obedience to only one federal court, namely, the Supreme Court." *Barstow v. State,* 742 S.W.2d 495, 501 n. 2 (Tex.App. 1987, writ denied) (quoting from Moore & Oglebay, *The Supreme Court, Stare Decisis and Law of the Case,* 21 Tex.L.Rev. 514, 525 (1943)); *accord Turner v. PV Int'l Co.,* 765 S.W.2d 455, 470 (Tex.App.1988), writ denied per curiam, 778 S.W.2d 865 (Tex.1989); *Omniphone, Inc. v. Southwestern Bell Tel. Co.,* 742 S.W.2d 523, 526 (Tex.App.1987, no writ); *Woodard v. Texas Dept. of Human Resources,* 573 S.W.2d 596, 598 (Tex.Civ.App.1978, writ ref'd n.r. e.); *cf. Summertree Venture III v. FSLIC,* 742 S.W.2d 446, 449–50 (Tex.App.1987, writ denied).

The rationale for this view is well summarized in the following passage:

> [T]he state courts, when adjudicating federal questions, form an integral part of the national judicial hierarchy and apply their own law, not that of another sovereign. In that capacity they occupy exactly the same position as the lower federal courts, which are coordinate, and not superior to them. There is no appeal from the state to the lower federal courts. Instead both are subject to the reviewing power of the Supreme Court, which furnishes the unifying principle. Decisions of a lower federal court are no more binding on a state court than they are on a federal court not beneath it in the judicial hierarchy.

Note, *Authority in State Courts of Lower Federal Court Decisions on National Law,* 48 Colum.L.Rev. 943, 946–47 (1948) (footnotes omitted). These sound principles seem to represent the majority view among the states. *See* Annotation, *Duty of state courts to follow decisions of Federal courts, other than the Supreme Court, on Federal questions,* 147 A.L.R. 857 (1943).

In *Olson v. Holmes,* 571 S.W.2d 211 (Tex.Civ.App.1978), writ ref'd n.r.e. per curiam, 587 S.W.2d 678 (Tex.1979), this Court, faced with conflicting constructions of a federal statute by a state court of appeals and a federal court of appeals, opted to follow the federal court. This Court's opinion stated that, because we were dealing with rights conferred by federal statute and regulation, "our determination of the appeal should be governed by the federal courts' construction of the statute and regulation." 571 S.W.2d at 213. In so stating, we did not intend to hold that this Court was absolutely *bound* by the decisions of lower federal courts, but only to acknowledge that such decisions are entitled to due weight and consideration. Therefore, we accord a like meaning to the Texas Supreme Court's per curiam opinion in *Olson,* in which it echoed and approved this Court's "should-be-governed-by" language. 587 S.W.2d at 679.

Accordingly, we conclude that, although they have persuasive value, lower federal court opinions interpreting the Labeling Act are not conclusive in this appeal.

## GENERAL PREEMPTION PRINCIPLES

■ The supremacy clause of the United States Constitution provides: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land

... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. The question whether, pursuant to the supremacy clause, a particular federal law preempts state action is "largely a matter of statutory construction." L. Tribe, *American Constitutional Law* 480 (2d ed. 1988). An examination of congressional intent is required. *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 299, 108 S.Ct. 1145, 1150, 99 L.Ed.2d 316 (1988).

The following passage summarizes the general principles of preemption:

Federal law may supersede state law in several different ways. First, when acting within constitutional limits, Congress is empowered to pre-empt state law by so stating in express terms. E.g., *Jones v. Rath Packing Co.* 430 US 519, 525, 51 LEd2d 604, 97 SCt 1305 [1309] (1977). Second, congressional intent to pre-empt state law in a particular area may be inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress "left no room" for supplementary state regulation. *Rice v. Santa Fe Elevator Corp.* 331 US 218, 230, 91 LEd 1447, 67 SCt 1146 [1152] (1947)....

As a third alternative, in those areas where Congress has not completely displaced state regulation, federal law may nonetheless pre-empt state law to the extent it actually conflicts with federal law. Such a conflict occurs either because "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 US 132, 142–143, 10 LEd2d 248, 83 SCt 1210 [1217–1218] (1963), or because the state law stands "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 US 52, 67, 85 LEd 581, 61 SCt 399 [404] (1941).

*California Federal Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 280–81, 107 S.Ct. 683, 689–90, 93 L.Ed.2d 613 (1987). The starting point in any preemption analysis is "the basic assumption that Congress did not intend to displace state law." *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 2128, 68 L.Ed.2d 576 (1981).

No court has held that the Labeling Act expressly preempts common-law tort claims by persons injured from smoking cigarettes; nor has any court held that the Labeling Act so comprehensively "occupies the field" as to preempt common-law claims on that basis; nor has any court held that it would be impossible to comply with both the Labeling Act and any adverse judgments that might grow out of common-law tort claims. We likewise decline to find common-law claims preempted on any of those bases. Accordingly, the issue this Court must decide is whether the availability of state common-law tort remedies to persons injured by smoking cigarettes impedes the accomplishment and execution of the purposes and objectives of the Labeling Act to such a degree that we should infer a congressional intent to eliminate such remedies.

## PREEMPTION OF DAMAGE AWARDS

More than thirty years ago the Supreme Court, in deciding whether a claim for damages was preempted, stated that

[o]ur concern is with delimiting areas of conduct which must be free from state regulation if national policy is to be left unhampered. Such regulation can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy. Even the States' salutary effort to redress private wrongs or grant compensation for past harm cannot be exerted to regulate activities that are potentially subject to the exclusive federal regulatory scheme.

*San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 246–47, 79 S.Ct. 773, 780–81, 3 L.Ed.2d 775 (1959). Although *Garmon* concerned the primary jurisdiction of the National Labor Relations Board and *Garmon's* claim was founded on a statutory—rather than common-law—cause of action, the case firmly established the prin-

ciple that damage awards can have a regulatory effect and, where appropriate, damage claims will be subject to preemption.

In the course of balancing state and federal interests to protect the primary jurisdiction of the NLRB, the Supreme Court has recognized numerous exceptions to strict application of the *Garmon* preemption doctrine, most notably where the state activity in question touches interests that are "deeply rooted in local feeling and responsibility." *Garmon,* 359 U.S. at 244, 79 S.Ct. at 779; *cf. Brown v. Hotel and Restaurant Employees,* 468 U.S. 491, 502–03, 104 S.Ct. 3179, 3185–86, 82 L.Ed.2d 373 (1984). The Court has said that "inflexible application of the [*Garmon*] doctrine is to be avoided, especially where the State has a substantial interest in regulation of the conduct at issue and the State's interest is one that does not threaten undue interference with the federal regulatory scheme." *Farmer v. United Brotherhood of Carpenters,* 430 U.S. 290, 302, 97 S.Ct. 1056, 1064, 51 L.Ed.2d 338 (1977). Such holdings are instructive in the present case, though our factual setting is distinct.

## THE PRESUMPTION AGAINST PREEMPTION

As stated previously, the Supreme Court recognizes a basic presumption against preemption. *Maryland v. Louisiana,* 451 U.S. at 746, 101 S.Ct. at 2129. In matters traditionally regulated by states and localities, however, that presumption is even stronger: "[When Congress legislates] in a field which the States have traditionally occupied ... we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the *clear and manifest purpose* of Congress." *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947) (emphasis added). Stated differently, "we are not to conclude that Congress legislated the ouster of [a state statute] ... in the absence of an *unambiguous congressional mandate* to that effect." *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 146–47, 83 S.Ct. 1210, 1219–20, 10 L.Ed.2d 248 (1963) (emphasis added). As Professor Tribe has stated,

> As a corollary of the rule that state action will not lightly be found to be inconsistent with federal policy, not only are broad and abstract federal goals given scant preemptive effect, but even congressional goals that are tightly-stated will be interpreted narrowly when testing traditional forms of state action for conflict with those goals.

L. Tribe, *supra* at 489.

The Labeling Act touches directly on matters of public health and safety. Therefore, the Act regulates in an area of traditional state control. *See Hillsborough County v. Automated Medical Laboratories, Inc.,* 471 U.S. 707, 719, 105 S.Ct. 2371, 2378, 85 L.Ed.2d 714 (1985) ("[T]he regulation of health and safety matters is primarily, and historically, a matter of local concern.").

Nonetheless, one of the defendants urges us to adopt the view of the Eleventh Circuit expressed in *Taylor v. General Motors Corp.,* 875 F.2d 816 (11th Cir.1989), cert. denied, —— U.S. ——, 110 S.Ct. 1781, 108 L.Ed.2d 783 (1990):

> [I]n contrast to the strong presumption against preemption that we apply in determining whether the language of a federal statute or regulation expressly preempts state law, no such presumption is applicable in deciding whether state law conflicts with federal law, even where the subject of the state law is a matter traditionally regarded as properly within the scope of the states' rights. *See Felder v. Casey,* 487 U.S. 131, 137, 108 S.Ct. 2302, 2306, 101 L.Ed.2d 123 (1988)....

875 F.2d at 826.

We think *Taylor* paints with too broad a brush. First, the case cited as support for the proposition, *Felder v. Casey,* 487 U.S. 131, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988), in fact provides no support. The Court in *Felder* did not hold, or even imply, that no presumption against preemption existed in conflict-preemption cases. The Wisconsin Supreme Court had ordered dismissal of a plaintiff's civil rights action, brought under

42 U.S.C. § 1983 (1981), for failure to comply with Wisconsin's 120–day notice-of-claim statute. 408 N.W.2d 19. The Wisconsin court reasoned, in part, that the notice requirement advanced "the State's legitimate interests in protecting against stale or fraudulent claims, facilitating prompt settlement of valid claims, and identifying and correcting inappropriate conduct by governmental employees and officials." 487 U.S. at 137, 108 S.Ct. at 2306. In responding to this argument, the United States Supreme Court merely quoted the following rule:

> Under the Supremacy Clause of the Federal Constitution, "[t]he relative importance to the State of its own law is not material when there is a conflict with a valid federal law," for "any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Free v. Bland,* 369 US 663, 666, 8 LEd2d 180, 82 SCt 1089 [1092] (1962).

487 U.S. at 138, 108 S.Ct. at 2306. Like *Felder, Free v. Bland,* 369 U.S. 663, 82 S.Ct. 1089, 8 L.Ed.2d 180 (1962), was a case in which actions authorized by federal law directly conflicted with state law. In *Free,* federal law authorized survivorship provisions in United States Savings Bonds. Texas community property law, however, had been held to disallow any agreement to a survivorship provision with regard to community property. *See Hilley v. Hilley,* 342 S.W.2d 565 (Tex.1961). A more direct conflict can hardly be imagined.

We agree wholeheartedly that, as a practical matter, where a right expressly granted by federal law is conditioned or limited by state law, or an action expressly authorized by federal law violates state law, the "relative importance to the State of its own law is not material." Logic and the supremacy clause dictate this result. Not all conflict-preemption cases involve such direct and unmistakable conflicts, however. Indeed, the Supreme Court has recognized a distinction between, on the one hand, "impossibility" cases such as *Florida Avocado Growers* and "outright or actual conflict" cases such as *Free* and, on the other hand, "obstacle" or "frustration" cases

such as *Hines v. Davidowitz,* 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941). *See Louisiana Public Service Comm'n v. FCC,* 476 U.S. 355, 368–69, 106 S.Ct. 1890, 1898–99, 90 L.Ed.2d 369 (1986). The latter category of cases can present very difficult statutory-construction and policy questions. The congressional objective may be difficult to ascertain. Or, the congressional enactment may have multiple objectives, some more important than others. The effect of state law on congressional objectives may be quite mild. Or, the overall effect of state law may be difficult to predict, particularly in the instance of multiple congressional goals. It is in such close and difficult cases that a presumption against preemption seems to us most appropriate:

> By declining to infer preemption in the face of congressional ambiguity, the Court is not interposing a judicial barrier to Congress's will in order to protect state sovereignty—an interposition that would violate *Garcia [v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985) ]—but is instead furthering the spirit of *Garcia* by requiring that decisions restricting state sovereignty be made in a deliberate manner by Congress, through the explicit exercise of its lawmaking power to that end.

L. Tribe, *supra* at 480.

In addition, the Supreme Court itself obviously does not follow the *Taylor* court's interpretation of *Felder.* In *California v. ARC America Corp.,* 490 U.S. 93, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989), a case decided *after Felder,* the Court expressly recognized that "[a]ppellees' only contention [in this case] is that state laws permitting indirect purchaser recoveries pose an obstacle to the accomplishment of the purposes and objectives of Congress." at 102, 109 S.Ct. at 1666, 104 L.Ed.2d at 95. Nonetheless, the Court held that:

> In this case, in addition, appellees must overcome the presumption against finding pre-emption of state law in areas traditionally regulated by the States. See *Hillsborough County v. Automated Medical Laboratories, Inc.* 471 US 707,

716, 85 LEd2d 714, 105 SCt 2371 [2376] (1985). When Congress legislates in a field traditionally occupied by the States, "we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.* 331 US 218, 230, 91 LEd 1447, 67 SCt 1146 [1152] (1947).

*Id.* 490 U.S. at 101, 109 S.Ct. at 1665, 104 L.Ed.2d at 94.

We conclude, therefore, that the present case requires application of the "heightened" presumption against preemption described in the foregoing cases.

## DISCUSSION: PREEMPTION BY THE LABELING ACT IN THE PRESENT CASE

■ We have identified six factors that lead us to conclude that the Labeling Act does not reflect a clear, manifest, and unambiguous congressional intent to preempt the common-law tort claims alleged by the plaintiffs in the present case: (1) The "frustrating" effect of such claims on congressional goals is speculative; (2) Avoiding diverse labeling regulations is the *secondary* goal of the Act; the *primary* goal—informing the public of the hazards of cigarette smoking—would arguably be enhanced by permitting common-law tort claims; (3) A holding that the plaintiffs' claims are preempted would leave them without any remedy for the defendants' allegedly tortious conduct; (4) Congress could easily have expressly preempted common-law tort claims, but did not do so; (5) The legislative history of the Labeling Act gives no indication that Congress intended to preempt common-law tort claims; and (6) The Comprehensive Smokeless Tobacco Health Education Act of 1986 evinces congressional intent that common-law tort claims not be preempted.

We note initially that the defendants' strongest case for preemption lies with failure-to-warn claims. Indeed, *Pennington, Forster,* and *Hite,* while concluding that failure-to-warn claims are preempted, determined that claims based on other legal theories are not. Accordingly, in the following discussion we will, where appropriate, focus our analysis on failure-to-warn claims, with the understanding that we consider claims based on other theories to be even stronger against preemption.

### 1. *Speculative conflict*

The "obstacle" standard for determining whether state law "actually conflicts" with federal law was enunciated in *Hines v. Davidowitz,* 312 U.S. 52, 67–68, 61 S.Ct. 399, 404–405, 85 L.Ed. 581 (1941):

In the final analysis, there can be no one crystal clear distinctly marked formula. Our primary function is to determine whether under the circumstances of this particular case, [the state] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.[20]

[20] Cf. *Savage v. Jones,* 225 US 501, 533, 56 L ed 1182, 1195, 32 S Ct 715 [725]: "... If the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress within the sphere of its delegated power."

Defendants argue that permitting claims such as those alleged by the plaintiffs will frustrate the "uniformity" goal stated in section 1331 of the Labeling Act:

[That] commerce and the national economy may be (A) protected to the maximum extent consistent with this declared policy [of informing the public of the health hazards of cigarette smoking] and (B) not impeded by diverse, nonuniform, and confusing cigarette labeling and advertising regulations with respect to any relationship between smoking and health.

15 U.S.C. § 1331. We disagree. By awarding damages, courts do not *compel* any behavior, other than requiring a particular defendant to pay compensation to a particular plaintiff:

A damages award ... requires only payment—it is not an injunction requiring the defendant to incorporate into its advertising a fixed legend different from the federally required label. The labeling acts do not prohibit a manufacturer

from warning of undisclosed health risks. The only prohibition is against a state agency passing a law requiring cigarette companies to use a different label. Garner, *Cigarette Dependency and Civil Liability: A Modest Proposal,* 53 S.Cal.L. Rev. 1423, 1454 (1980).

We are mindful that a damages award may motivate a defendant to change his future behavior voluntarily, but what the nature of that change will be is purely speculative. A cigarette manufacturer that was required to pay a damages award because it had failed to adequately warn of the hazards of smoking cigarettes would have several options. For example, the manufacturer could choose to increase the safety of its product. Or, it could choose simply to absorb the expense of any damage awards, either by raising prices or by decreasing its profit margin. As Justice Blackmun stated in his dissent in *Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984),

> When a victim is determined to be eligible for a compensatory award, that award is calculated by reference to the victim's injury. Whatever compensation standard a State imposes, whether it be negligence or strict liability, a [nuclear] licensee remains free to continue operating under federal standards and to pay for the injury that results.

464 U.S. at 264, 104 S.Ct. at 629 (Blackmun, J., dissenting). Or, the manufacturer could include additional health information in cigarette packages without changing the package and advertisement warnings. Finally, the manufacturer could, of course, choose to increase the strength of its warning. As noted by the district court in *Cipollone I,* which course the producer of a defective product takes "depends upon a complex combination of economics, morality and psychology." 593 F.Supp. at 1156.

In light of the manufacturers' options and the variables that influence their choices, it is simply not clear that common-law damage awards against cigarette manufacturers would result in the "diverse, nonuniform, and confusing cigarette labeling and advertising regulations" Congress sought to avoid through the Labeling Act. We conclude, therefore, that the potential conflict asserted by defendants is too speculative to warrant preemption. *See English v. General Elec. Co.,* —— U.S. ——, ——, 110 S.Ct. 2270, 2280, 110 L.Ed.2d 65, 81 (1990) ("[P]reemption is ordinarily not to be implied absent an 'actual conflict.' "); *Rice v. Norman Williams Co.,* 458 U.S. 654, 659, 102 S.Ct. 3294, 3299, 73 L.Ed.2d 1042 (1982) ("The existence of a hypothetical or potential conflict is insufficient to warrant the pre-emption of the state statute."); *Huron Portland Cement Co. v. City of Detroit,* 362 U.S. 440, 446, 80 S.Ct. 813, 817, 4 L.Ed.2d 852 (1960) ("[T]his Court's decisions ... enjoin seeking out conflicts between state and federal regulation where none clearly exists.").

### 2. *Secondary goal*

The Third Circuit in *Cipollone* stated that the Labeling Act represented "a carefully drawn balance between the purposes of warning the public of the hazards of cigarette smoking and protecting the interests of national economy." 789 F.2d at 187. The First Circuit in *Palmer* stated that, although the Act had two "policies," it had "only one purpose: to strike a fair, effective balance between these two competing interests." 825 F.2d at 626. Our reading of the Act and its legislative history reveals no such delicate balance.

The primary purpose of the Act is to inform the public of the hazards of cigarette smoking. The legislative history of the Act indicates plainly that "[t]he principal purpose of the bill is to provide adequate warning to the public of the potential hazards of cigarette smoking...." 1965 U.S.Code Cong. & Admin.News 2350.[5] The

---

5. *See also* the letter, dated April 7, 1965, from Robert E. Giles, General Counsel of the Department of Commerce, to Congressman Oren Harris, Chairman of the House Committee on Interstate and Foreign Commerce:

> One basic objective of each of these bills is the same—to protect the health of consumers and prospective consumers of cigarettes. H.R. 3014 and H.R. 4007 have the additional stated objective of protecting commerce and

policy of protecting commerce and the economy is secondary, being protected only to the extent "consistent with this declared policy," i.e., the policy of informing the public.

> Instead of treating "these two competing interests" equally, Congress subordinated the economic interests of the tobacco industry and the national economy to the more pressing interests of public health and information. Thus, state tort actions cannot disrupt excessively a carefully drawn balance of purpose that is, in fact, no balance at all.

Comment, *Inadequate Warning Claims Preempted by Cigarette Labeling Act: Palmer v. Liggett Group, Inc.,* 34 Loy.L. Rev. 419, 430 (1988).

Moreover, holding common-law claims preempted would remove the motivation for cigarette manufacturers to voluntarily include additional health information and/or warnings in or on cigarette packages and advertisements. That sort of disincentive would actually hinder the Act's primary purpose of achieving wide dissemination of such information. We find it difficult to believe that Congress would have built such a contradiction into the Act. In response to a similar contention, the Court of Appeals for the District of Columbia Circuit stated:

> [I]f we are to adopt [the cigarette manufacturers'] analysis, we must conclude that Congress legislated to curtail the potential flow of information lest the public learn too much about the hazards of smoking for the good of the tobacco industry and the economy. We are loathe [sic] to impute such a purpose to Congress absent a clear expression.

*Banzhaf v. FCC,* 405 F.2d 1082, 1089 (D.C. Cir.1968), cert. denied, 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969).

### 3. *No Remedy*

The Labeling Act provides no federal remedies, administrative or otherwise, for persons who claim to have been harmed as a result of cigarette manufacturers' tortious conduct. Thus, preemption in the present case would leave the plaintiffs without a remedy.

The United States Supreme Court has generally been unwilling to permit such a result. For example, in *United Construction Workers v. Laburnum Construction Corp.,* 347 U.S. 656, 74 S.Ct. 833, 98 L.Ed. 1025 (1954), a labor case, the Court used the following words to distinguish an earlier ruling:

> In [*Garner v. Teamsters C. & H. Local Union,* 346 U.S. 485, 74 S.Ct. 161, 98 L.Ed. 228 (1953)], Congress had provided a federal administrative remedy, supplemented by judicial procedure for its enforcement, with which the state injunctive procedure conflicted. Here Congress has neither provided nor suggested any substitute for the traditional state court procedure for collecting damages for injuries caused by tortious conduct. For us to cut off the injured respondent from this right of recovery will deprive it of its property without recourse or compensation. To do so will, in effect, grant petitioners immunity from liability for their tortious conduct. We see no substantial reason for reaching such a result.

347 U.S. at 663–64, 74 S.Ct. at 836–37 (footnote omitted). The plaintiff in *Linn v. United Plant Guard Workers,* 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966), another labor case, sought damages for malicious libel. In concluding that state common-law remedies were not preempted, the Court stressed that the "inability [of the National Labor Relations Board] to provide redress to the maligned party[ ] vitiates the ordinary arguments for pre-emption." *Id.* at 64, 86 S.Ct. at 664; *see also Farmer,* 430 U.S. at 298, 97 S.Ct. at 1062. Thus, even in the area of labor law, where the interests of the federal government have long been recognized as preeminent, the Supreme

---

the national economy. While we would ordinarily strongly support both objectives, we feel that ... the proposed means of attaining the latter objective may be incompatible with the health protection objective. Under such circumstances we believe that the public health interest must prevail.

1965 U.S.Code Cong. & Admin.News 2350, 2361.

Court has been reluctant to preempt state common-law tort claims.

The Supreme Court has taken a similar view outside the labor law context. In *Silkwood*, the Court held that a state common-law tort claim was not preempted by the Atomic Energy Act, notwithstanding that less than a year earlier, in *Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n*, 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983), the Court had held that, with narrow exceptions, the federal government had "occupied the entire field of nuclear safety concerns." 461 U.S. at 212–13, 103 S.Ct. at 1726–27. Justice White, writing for the *Silkwood* majority, stated that the failure of Congress to expressly preempt state-law remedies

> takes on added significance in light of Congress' failure to provide any federal remedy for persons injured by such conduct. *It is difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct.* See *Construction Workers v. Laburnum Corp.*, 347 US 656, 663–664, 98 LEd 1025, 74 SCt 833 [836–837] (1954).

464 U.S. at 251, 104 S.Ct. at 623 (emphasis added). In dissent, Justice Blackmun echoed this dim view of leaving injured persons without a remedy:

> Because the Federal Government does not regulate the compensation of victims, and because *it is inconceivable that Congress intended to leave victims with no remedy at all,*[7] the pre-emption analysis established by Pacific Gas comfortably accommodates—indeed it compels—the conclusion that compensatory damages are not pre-empted whereas punitive damages are.

[7] ... The absence of federal regulation governing the compensation of victims of nuclear accidents is strong evidence that Congress intended the matter to be left to the States.

464 U.S. at 263–64, 104 S.Ct. at 629–30 (Blackmun, J., dissenting) (emphasis added).

In the context of this discussion, the distinction between common-law remedies and statutory remedies may also be significant. Common-law tort remedies reflect a recognition, often of many centuries' duration, that a person injured by wrongful conduct is entitled to some sort of remedy against the tortfeasor to compensate for his injuries. They reflect a conclusion that society ought, for the good of the whole, to formally sanction and assist in enforcing such remedies. To take from an injured person all such remedies, without any replacement, threatens the very foundation of our legal system: "[T]he refusal to redress an otherwise actionable wrong creates disrespect for the law and encourages the victim to take matters into his own hands." *Linn*, 383 U.S. at 64 n. 6, 86 S.Ct. at 664 n. 6. To infer that Congress set out to eliminate such remedies without even commenting on their elimination would be even more perilous.

Statutory remedies, on the other hand, while representing the conclusion of a legislature that certain conduct should be compensable, do not carry the sanction of ancient societal expectations. Indeed, legislatures have been known to create relatively fleeting rights: here today, gone tomorrow. Moreover, in the context of state and federal relations, it is significant that the purpose of a legislatively created cause of action is more likely to be *regulation of conduct* than compensation of victims. Although the purpose of a state law is not a major factor to be considered in deciding preemption questions, *Perez v. Campbell*, 402 U.S. 637, 651–52, 91 S.Ct. 1704, 1712–13, 29 L.Ed.2d 233 (1971), it cannot be ignored, *Pacific Gas & Electric*, 461 U.S. at 216, 103 S.Ct. at 1728.

At least one federal court of appeals has held that a full-blown balancing of state and federal interests, presumably similar to that required before *Garmon*-preemption may be applied, is appropriate in the present analysis:

> A decision about preemption on that ground [, i.e., frustration of federal purpose] requires the court independently to consider national interests and their putative conflict with state interests. While preemption under a theory of ex-

press or implied preemption is essentially a matter of statutory construction, preemption under a frustration of federal purpose theory is more an exercise of policy choices by a court than strict statutory construction.

*Abbot v. American Cyanamid Co.,* 844 F.2d 1108, 1113 (4th Cir.1988). While we express no disagreement with this conclusion, the present case does not demand a determination of the issue. A holding of preemption would leave plaintiffs, allegedly injured by the tortious conduct of defendants, without a remedy. If, by our inquiry into the Labeling Act, we are truly seeking congressional intent, we cannot ignore a consequence of such import.

### 4. *Congressional silence*

Smokers who have developed lung cancer and other diseases have been suing cigarette manufacturers under state tort law since at least as far back as the 1950's. *See* Comment, *The Product Liability of the Tobacco Industry: Has Cipollone v. Liggett Group Finally Pierced the Cigarette Manufacturers' Aura of Invincibility?,* 30 B.C.L.Rev. 1103, 1117–26 (1989). The Supreme Court has held, as early as 1959, that damage awards can have a regulatory effect and that damage suits under state law are subject to being preempted by federal statutes. *See Garmon,* 359 U.S. at 247, 79 S.Ct. at 780. The Supreme Court has been stating since at least 1947 that, in areas traditionally regulated by the states, such as health and safety, courts will presume that preemption of state law was not intended unless the contrary is shown to be the "clear and manifest purpose of Congress." *Rice,* 331 U.S. at 230, 67 S.Ct. at 1152. We must presume that Congress was aware of such lawsuits and judicial decisions when it passed and later amended the Labeling Act.

Yet, when Congress decided to include an express preemption provision in the Labeling Act, it made no mention of preempting damage suits or awards. All courts, including the five federal courts of appeals cited above, agree that the Labeling Act does not expressly preempt common-law claims. Given the "drastic clarity" with which Congress can speak when it so desires, and considering that in section 1334 of the Act it spoke with some clarity about other areas of preemption, its failure to speak on the subject of common-law claims is significant. Even in *Hines,* the Supreme Court recognized that "where the Congress, while regulating related matters, has purposely left untouched a distinctive part of a subject which is peculiarly adapted to local regulation, the state may legislate concerning such local matters which Congress could have covered but did not." 312 U.S. at 68 n. 22, 61 S.Ct. at 405 n. 22. Although there may be "manifest dangers in trying to discern the tune when listening to the sounds of Congressional silence ... the benefit of the doubt in our Federal system is tilted against Federal pre-emption of state law: the symphonic tie normally goes to the plaintiffs." L. Tribe, *Federalism With Smoke and Mirrors,* The Nation 788, 788–89 (June 7, 1986).

### 5. *Legislative history*

Although reliance on legislative history to discern congressional intent is "a step to be taken cautiously," *Piper v. Chris–Craft Indus., Inc.,* 430 U.S. 1, 26, 97 S.Ct. 926, 941, 51 L.Ed.2d 124 (1977), the legislative history of the Labeling Act is significant for our purposes in at least three respects. First, in virtually every congressional discussion, statements about preemption are couched in terms of "laws" or "regulations" in the sense of legislative enactments, rather than "regulation" in a broader sense. During the 1965 debates, for example, House Report No. 449 described congressional fear that "a multiplicity of State and local regulations pertaining to labeling of cigarette packages could create chaotic marketing conditions and consumer confusion." 1965 U.S.Code Cong. & Admin.News 2350, 2352. In 1969 the Senate Commerce Committee stated the following in Senate Report No. 91–566:

> In some instances, counties or municipalities exercise their authority over advertising by local ordinances, or regulations, or even occasionally by resolution. In order to avoid the chaos created by a

multiplicity of conflicting regulations, however, the bill preempts State requirements or prohibitions with respect to the advertising of cigarettes based on smoking and health. This preemption is intended to include not only action by State statute but by all other administrative actions or local ordinances or regulations by any political subdivision of any State. 1970 U.S.Code Cong. & Admin.News 2652, 2663. In addition, individual statements by senators, congressmen, and other interested parties seem to reflect the same focus. *See* the numerous examples cited by the district court in *Cipollone I*, 593 F.Supp. at 1159–61.

Second, the congressional reports, debates, and discussions touching on the preemption issue contain no mention whatsoever of preempting common-law tort claims. In light of the strong presumption against preemption, such silence is telling. "[T]he conspicuous absence [in congressional debates] of any reference to the preemption of state common law claims ... evidences Congress' intention to preclude only state and local legislatures from passing conflicting labeling laws." Comment, *Common Law Claims Challenging Adequacy of Cigarette Warnings Preempted Under the Federal Cigarette Labeling and Advertising Act of 1965: Cipollone v. Liggett Group, Inc.*, 60 St. John's L.Rev. 754, 762 n. 32 (1986).

Finally, even the discussions that mention common-law claims do so in the context of considering the effect of the Act on a defendant's "assumption of the risk" defense in a tort action:

MR. MACKAY: I would like to ask you this as a lawyer. Would not the presence of the type of warning suggested in these bills greatly strengthen the hand of a defendant in a tort case?

MR. ELLENBOGEN: In the long run it might do so, because those cases that I have read—and I have not made a real study of this particular thing—but the *Green* case, for example, is based, I believe, on the implied warranty of fitness, and there being no notice of the health hazard to the consumer.

*Hearings on H.R. 2248, 3014, 4007, and 4249 Before the House Committee on Interstate and Foreign Commerce*, 89th Cong., 1st Sess. 176 (1965) (statement of Theodore Ellenbogen, Acting Assistant General Counsel of the Department of Health, Education, and Welfare). *See also Cipollone I*, 593 F.Supp. at 1162–63. The very existence of debate over the effect of the Act on substantive defenses is inconsistent with the notion that Congress intended to preempt common-law claims.

### 6. *Smokeless Tobacco Act*

Also worthy of note on the issue of congressional intent is the passage in 1986 of the Comprehensive Smokeless Tobacco Health Education Act, 15 U.S.C. §§ 4401–4408 (Supp.1990) (Smokeless Tobacco Act). The legislative history of that Act indicates that its passage was spurred by the recent resurgence of smokeless tobacco products. Not surprisingly, it was patterned after the Labeling Act: "[The Smokeless Tobacco Act], for the most part, simply extends the provisions of P.L. 98–474, the Comprehensive Smoking Education Act of 1984, to include smokeless tobacco products." 1986 U.S.Code Cong. & Admin.News 7, 11.

Although patterned after the Labeling Act, the Smokeless Tobacco Act contains some significant differences from its source. Chief among these, for our purposes, is the presence in the preemption section of the following provision: "Nothing in this chapter shall relieve any person from liability at common law or under State statutory law to any other person." 15 U.S.C. § 4406(c).

Although an analysis of the various differences between the two Acts seems to us a highly problematic inquiry, two conclusions can readily be drawn. First, although the Smokeless Tobacco Act does not contain an express statement of purpose, as the Labeling Act does, logic compels the conclusion that their purposes are parallel, if not identical: (1) to inform the public about the dangers of tobacco product use, and (2) to protect commerce as much as possible, consistent with the primary objective of informing the public of health hazards, by preventing diverse label-

ing regulations. Second, by expressly providing that state common-law claims were not preempted, Congress indicated its belief that such claims would not unduly frustrate its goal of preventing diverse labeling regulations:

> The existence of a savings clause in the Smokeless [Tobacco] Act could be helpful to either side of the preemption debate. The more reasonable interpretation of this legislation, however, is that it expresses the ongoing, unchanging, undiminished intent of Congress not to preclude common-law causes of action for failure to warn against the tobacco industry.

Comment, *Preemption of Recovery in Cigarette Litigation: Can Manufacturer Be Sued for Failure to Warn Even Though They Have Complied with Federal Warning Requirements?*, 20 Loyola L.A.L.Rev. 867, 918–19 (1987).

## FLAWS OF PRIOR CIGARETTE CASES

The cases holding common-law tort claims to be preempted by the Labeling Act have been justifiably criticized. In the leading case, *Cipollone I*, the court of appeals disregarded legislative history, ignored the fact that preemption would leave the plaintiff without a remedy, and gave little weight to the heightened presumption against preemption. 789 F.2d 181. Of that court's treatment of the preemption issue, Professor Tribe has stated:

> The Third Circuit [in *Cipollone I*], in reading Congress' preemption language expansively, apparently found that Congress meant to exempt the tobacco industry from the choice, faced by manufacturers in virtually every other industry, among increasing product safety, increasing warnings, or paying damages to injured consumers. That holding seems hard to square with *Silkwood* and with the Supreme Court's admonition that there is an overriding presumption that "Congress did not intend to displace state law."

L. Tribe, *supra* at 490–91 (footnotes omitted). That critical view has generally been echoed by other commentators. *See* Comment, *supra*, 30 B.C.L.Rev. 1103 (1989); Comment, *supra*, 20 Loy.L.A.L.Rev. 867 (1987); Edell & Walters, *The Doctrine of Implied Preemption in Products Liability Cases—Federalism in the Balance*, 54 Tenn.L.Rev. 603 (1987) (in fairness, we note that the authors of this article have represented plaintiffs in several lawsuits against cigarette manufacturers); Comment, *supra*, 60 St. John's L.Rev. 754 (1986).

Finally, Judge Gibbons, the Chief Judge of the Third Circuit, wrote in a concurring opinion to *Cipollone II* that

> I believe that our interlocutory ruling [in *Cipollone I*] on the preemptive effect of the Labeling Act, to the extent that we reached a definitive ruling, was wrong as a matter of law, and should be overruled by the court in banc.... Thus, while I join in Part XII [the preemption section] of the opinion of the court, I do so only because this panel is bound by what I believe to be an erroneous opinion of the Court.

893 F.2d at 583. In light of the number of courts that have followed the preemption holding of *Cipollone I*, Judge Gibbons's comments are tinged with irony.

The decision in *Palmer* is likewise flawed. While Third, Fifth, Sixth, and Eleventh Circuit panels incorrectly ignored the consequence of leaving their respective plaintiffs without any remedy, in *Palmer* the First Circuit brushed aside the plaintiff's "no remedy" argument with two statements that are unsatisfactory, at best. First, the court stated that, unlike the activities in *Silkwood* and *Laburnum*, "cigarette smoking, at least initially, is a voluntary activity." 825 F.2d at 627. Among other vices, this statement—without any support—erroneously discounts the possibility that smoking cigarettes could be shown to be addictive. Current medical research apparently supports the possibility of such an addictive effect.[6] That ad-

---

**6.** "The Surgeon General now classifies cigarette smoking as physiologically addictive, as do the National Institute of Drug Abuse and the American Psychiatric Association." Comment, *supra*, 30 B.C.L.Rev. at 1128 n. 179.

dictive property, if shown to exist, could transform what was initially a voluntary activity into an involuntary one, effectively placing a prospective plaintiff in exactly the same position as the plaintiffs in *Silkwood* and *Laburnum*.[7] Indeed, the failure to warn of cigarettes' addictive nature could be the essence of a plaintiff's complaint.[8] In such a case, the fact that the plaintiff's smoking may have been "initially" voluntary would be immaterial. Most importantly, however, the statement in *Palmer* inserts into the preemption decision a consideration that properly goes only to the merits of the case: by dismissing smoking as a "voluntary activity," the First Circuit held the plaintiff's claim preempted because, at least in part, he had "assumed the risk." This is improper preemption analysis. The voluntariness of the plaintiff's actions and the impact of that determination on the defendant's liability are issues for resolution on the merits of the case, not as part of the preemption decision.

Next, the *Palmer* court opined that "[t]he Supreme Court has often left parties without a remedy by finding state common law preempted." Cited as authority for this proposition were *Chicago & North Western Transportation Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981), and *Farmers Union v. WDAY*, 360 U.S. 525, 79 S.Ct. 1302, 3 L.Ed.2d 1407 (1959). Neither case supports the stated proposition. In *Kalo Brick*, extensive administrative remedies

were available to an aggrieved party. Indeed, the Supreme Court felt compelled to state in its opinion that "[o]ur decision today does not leave a shipper in respondent's position without a remedy if it is truly harmed." 450 U.S. at 331, 101 S.Ct. at 1137. In *WDAY*, federal law expressly prohibited the censorship of certain political speeches broadcast over the radio. The Court held that the statute's absolute prohibition gave radio stations immunity from libel claims arising out of such political speeches, i.e., common-law libel claims were preempted. Otherwise, the Court noted, the federal statute "would sanction the unconscionable result of permitting civil and perhaps criminal liability to be imposed for the very conduct the statute demands of the licensee." 360 U.S. at 531, 79 S.Ct. at 1306. We note initially that a person harmed by libelous remarks contained in such a speech would still have a cause of action against the maker of the speech and, therefore, would not be left without a remedy. Moreover, the statute in *WDAY* had the effect of mandating specific conduct, not merely *minimum* conduct.[9] *WDAY* was, therefore, a case in which it was not possible to comply with both the federal statute and state tort law. We agree that it is appropriate in such "impossibility" cases to infer congressional intent to preempt state damage claims of all types. However, the proposition that the Supreme Court has "often left parties without a remedy" by preempting state common-law tort claims in frustration-of-purpose cases is both incorrect and con-

---

7. "[M]edical research has determined that nicotine, which is present in tobacco and cigarette smoke, is an addictive drug that causes the smoker's inability to quit smoking despite his or her awareness of its health risks." Comment, *supra*, 30 B.C.L.Rev. at 1128 n. 179.

8. *See* Comment, *supra*, 30 B.C.L.Rev. at 1128–31; *cf. Crocker v. Winthrop Laboratories, Div. of Sterling Drug, Inc.*, 514 S.W.2d 429 (Tex.1974). A 1981 Federal Trade Commission report showed that, while 90% of the American public is aware that cigarettes are hazardous to health, over half of American adults do *not* know that cigarette smoking is addictive. *See* Comment, *supra*, 20 Loy.L.A.L.Rev. at 914 (1987).

9. We conclude that the Labeling Act requires only minimum conduct on the part of cigarette

manufacturers. The congressional goal appears to have been uniform labeling *regulations*, not uniform labels. Thus, manufacturers are not prevented from voluntarily placing stronger warnings on cigarette packages and advertisements. *Cf. Ferebee v. Chevron Chemical Co.*, 736 F.2d 1529, 1543 (D.C.Cir.), cert. denied, 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984); *Banzhaf v. Federal Communications Comm'n*, 405 F.2d 1082 (D.C.Cir.1968). "*Banzhaf* supports the argument that Congress did not seek to preempt the flow of information to the public, but only the affirmative requirement of additional labeling. Nothing short of that is inconsistent, incompatible, or an obstacle to Congress' purpose in legislating the Act." Comment, *supra*, 20 Loy.L.A.L.Rev. at 908.

trary to a healthy balance of state and federal sovereignty:

> [T]he [Supreme] Court is not in the practice of denying aggrieved parties any avenue of relief; it simply finds it acceptable to deprive them of one avenue when another is available. The *Palmer* court, on the other hand, has denied the plaintiffs their only avenue of relief, in contravention of the language in *Silkwood* and other cases. Instead of reaching to find preemption, courts who are about to deny plaintiffs their only avenue for compensation in an area traditionally controlled by state law should carefully scrutinize federal law to find unambiguous congressional intent to usurp the province of the state.

Comment, *supra*, 34 Loy.L.Rev. at 431.

### PREEMPTION CONCLUSION

We agree with the Minnesota Court of Appeals in *Forster* that "if there is a need to immunize the tobacco industry from tort liability, that decision must be made by Congress in an unambiguous mandate and *not* by the courts." 423 N.W.2d at 701 (emphasis in original). We agree with the district court in *Cipollone I* that "Congress intended that ... whatever tension exists between federal regulation of cigarette labeling and advertising and state common law claims be tolerated." 593 F.Supp. at 1168. And we agree with the Supreme Court of New Jersey in *Dewey* that "had Congress intended to immunize cigarette manufacturers from packaging, labeling, misrepresentation, and warning claims, it knew how to do so with unmistakable specificity." 577 A.2d at 1251.

We do not find in the Labeling Act and its legislative history, either expressly or by necessary implication resulting from conflict with state law, the clear, manifest, and unambiguous expression of congressional intent needed to require preemption of the common-law tort claims alleged here. The trial court's summary judgment was improper.

### MERITS OF PLAINTIFFS' CLAIMS

One of the defendants, R.J. Reynolds Tobacco Company, urges that, in the event this Court concludes that one or more of the plaintiffs' causes of action are not preempted, we should nonetheless affirm the trial court's judgment on the ground that the pleadings and summary judgment evidence show conclusively that none of the plaintiffs' claims is viable under substantive Texas law. We decline to address this question, however, for the reasons stated below.

In the trial court, defendants moved for summary judgment on two alternative grounds: (1) preemption, and (2) substantive product liability and first amendment law. The trial court's order, however, expressly recited that summary judgment was being granted "on the basis that all of the claims asserted by the plaintiffs ... for the post–1965 era are preempted by the provisions of the Cigarette Labeling and Advertising Act ... and the Supremacy Clause of the United States Constitution."

A rule often followed by appellate courts is that "[i]n reviewing the judgment of the trial court where there are no findings of fact and conclusions of law requested or filed, the judgment must be upheld on any legal theory that finds support in the evidence." *Strackbein v. Prewitt*, 671 S.W.2d 37, 38 (Tex.1984). Before 1978, a similar rule was followed in the review of summary judgments:

> [I]f it affirmatively appears from the pleadings, admissions, depositions and affidavits that there is no issue as to any material fact upon which the outcome of the litigation depends, then summary judgment is the proper remedy even though it be granted upon a ground different from that specified in the motion.

*In re Price's Estate*, 375 S.W.2d 900, 903–04 (Tex.1964); *see also Phil Phillips Ford, Inc. v. St. Paul Fire & Marine Ins. Co.*, 465 S.W.2d 933 (Tex.1971); *Trigg v. Blakemore*, 387 S.W.2d 465 (Tex.Civ.App.1965, writ ref'd n.r.e.).

■ In 1978, however, Rule 166a of the Texas Rules of Civil Procedure was amended to require that a motion for summary judgment "state the specific grounds therefor," and that "[i]ssues not expressly

presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal." Tex.R.Civ.P. 166a(c). In construing the effect of the 1978 amendments to Rule 166a, the Texas Supreme Court has expressed a strong concern that, in an appeal from a summary judgment, issues to be reviewed by the appellate court must have been actually presented to *and considered by* the trial court. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 675–77 (Tex.1979). Under *Clear Creek* and its progeny, a summary judgment can be neither reversed nor affirmed on any ground not specifically presented in the motion for summary judgment. *Dhillon v. General Accident Ins. Co.*, 789 S.W.2d 293, 295 (Tex.App.1990, no writ); *Houston Lighting & Power Co. v. Wheelabrator Coal Services Co.*, 788 S.W.2d 933, 936 (Tex.App.1990, no writ). Since 1978, therefore, the rule stated in *In re Price's Estate* and similar cases is no longer good law.

■ What, then, of a summary judgment order that expressly states the ground on which it is granted, when the underlying motion contained other independent grounds on which summary judgment was sought? We conclude that the ground specified in the judgment is the only one on which the summary judgment can be affirmed, for the following reasons. First, where a party has sought summary judgment on grounds A and B, a judgment expressly granting summary judgment on ground A, without mentioning ground B, can only be construed to mean that the trial court did not consider ground B. To construe it otherwise would be to permit and encourage an inference that is neither warranted by the record nor in keeping with the spirit of Rule 166a(c). Accordingly, we conclude that the trial court in the present case did not consider defendants'

"substantive-law" argument in deciding to grant the summary judgment.[10] Having reached this conclusion, it appears obvious that a ground not *considered* by the trial court is functionally identical to one not *presented* to the trial court; we can conceive of no reason to treat them differently.

■ Second, the following rule has, in the last ten years, become well established:

> Where a trial court enters a summary judgment order *that does not specify the particular ground on which it is based,* the party appealing must show that each independent argument alleged in the motion for summary judgment is insufficient to support the trial court's order.

*Insurance Co. of North America v. Security Ins. Co.*, 790 S.W.2d 407, 410 (Tex.App. 1990, no writ) (emphasis added). It is significant that (1) every opinion citing this rule has taken care to include the phrase emphasized above, indicating a unanimity of thought that the rule applies only when the summary judgment order does not specify the ground on which it is based; and (2) the rule has arisen since 1978, indicating that its formulation may well have been in response to the 1978 amendments to Rule 166a and to the supreme court's 1979 opinion in *Clear Creek*. *See Kyle v. West Gulf Maritime Ass'n*, 792 S.W.2d 805, 807 (Tex.App.1990, no writ); *Law v. Law*, 792 S.W.2d 150, 151 (Tex.App.1990, writ denied); *Rabe v. Guaranty Nat'l Ins. Co.*, 787 S.W.2d 575, 576 (Tex.App.1990, writ denied); *Tucker v. Atlantic Richfield Co.*, 787 S.W.2d 555, 558 (Tex.App.1990, writ denied); *Dyer v. Shafer, Gilliland, Davis, McCollum & Ashley, Inc.*, 779 S.W.2d 474, 478–79 (Tex.App.1989, writ denied); *Freedman v. Briarcroft Property Owners, Inc.*, 776 S.W.2d 212, 218 (Tex. App.1989 writ denied); *Tilotta v. Goodall,*

---

**10.** There are, in addition, more explicit indications that the trial court in the present case did not consider the defendants' substantive-law ground. The record indicates, albeit incompletely, that the trial court initially granted a continuance of the summary judgment hearing in order to allow the plaintiffs more time for discovery. Subsequently, the defendants filed a "motion for reconsideration" and convinced the court that the preemption issue did not require additional discovery. The trial court then agreed to hear that part of the defendants' motions that requested summary judgment on preemption grounds. All defendants except R.J. Reynolds concede this point in their brief: "[T]he issue whether cigarettes can be found defective or unreasonably dangerous under Texas state law is *not* before this Court."

752 S.W.2d 160, 161 (Tex.App.1988, writ denied); *FDIC v. Attayi*, 745 S.W.2d 939, 942 (Tex.App.1988, no writ); *Netterville v. Interfirst Bank*, 718 S.W.2d 921, 922 (Tex. App.1986, no writ); *McCrea v. Cubilla Condominium Corp.*, 685 S.W.2d 755, 757 (Tex.App.1985, writ ref'd n.r.e.); *Southerland v. Northeast Datsun, Inc.*, 659 S.W.2d 889, 891 (Tex.App.1983, no writ); *Thomson v. Norton*, 604 S.W.2d 473, 476–77 (Tex.Civ.App.1980, no writ). The logical corollary to this rule is, of course, that where a summary judgment order does specify the ground on which it is based, the party appealing need not refute other independent grounds that may have been alleged in the motion.

▇▇▇ We are aware of a contrary holding in *Veytia v. Seiter*, 740 S.W.2d 64 (Tex.App.1987), aff'd, 756 S.W.2d 303 (Tex. 1988). In *Veytia*, as here, summary judgment was sought on two grounds, federal preemption and substantive law. As here, the trial court's order specified that summary judgment was being granted on preemption grounds, apparently without mentioning the substantive-law argument. After concluding that summary judgment was not proper on preemption grounds, the appeals court decided that it was obliged to review the substantive-law ground to see if the summary judgment could be affirmed on that basis. Concluding that the substantive-law argument did not support the summary judgment either, the court reversed the trial court's judgment.

We decline to follow *Veytia*. First, for its relevant holding, the court in *Veytia* relied on *In re Price's Estate* and other cases that were clearly undercut by the 1978 amendments to Rule 166a. Moreover, it did so without any discussion of those amendments or the supreme court's *Clear Creek* opinion. Second, the Texas Supreme Court affirmed the court of appeals' reversal of the summary judgment in *Veytia* solely on preemption grounds, *without addressing the substantive-law argument.* If the correct rule were that independent

grounds contained in a motion for summary judgment but not considered by the trial court could nonetheless be a basis for the affirmance of a summary judgment, then the supreme court in *Veytia* would also have been obligated to consider, and reject, the substantive-law ground before it could affirm the court of appeals' reversal of the summary judgment.

We conclude, therefore, that the *Veytia* court incorrectly decided to review the substantive-law ground to determine if the summary judgment could be affirmed on that ground. We hold that where, as here, a summary judgment order specifies the ground or grounds on which it is based, without expressly ruling on other independent grounds alleged in the motion, such other grounds may not, on appeal, form the basis for affirming the summary judgment. On the basis of that holding, we decline to consider defendants' substantive-law arguments in this appeal.[11]

### CONCLUSION

For the foregoing reasons, the judgment of the trial court is reversed and the cause is remanded for further proceedings.

EARL W. SMITH, J., not participating.

---

**11.** If our earlier preemption discussion has seemed to imply that the plaintiffs would, in the absence of preemption, have viable causes of action, such expressions represent merely an

assumption made only for purposes of our preemption decision. Nothing herein should be taken as an expression of opinion as to the merits of the plaintiffs' claims.